

1 | RICHARD J. IDELL, ESQ. (SBN 069033)
2 | ORY SANDEL, ESQ. (SBN 233204)
  | ELIZABETH J. REST, ESQ. (SBN 244756)
3 | IDELL & SEITEL LLP
  | 465 California Street, Suite 300
4 | San Francisco, CA 94104
  | Telephone: (415) 986-2400
5 | Facsimile: (415) 392-9259
6 |
7 | Attorneys for Plaintiffs Gregory R. Raifman and
  | Susan Raifman, individually and as Trustees for the
8 | Raifman Family Revocable Trust Dated 7/2/03,
  | and Gekko Holdings, LLC, an Alaska
9 | limited liability company, dba Gekko Breeding and Racing

FILED

MAY 1 4 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

EDL

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

GREGORY R. RAIFMAN, individually and as Trustee of the RAIFMAN FAMILY REVOCABLE TRUST DATED 7/2/03, SUSAN RAIFMAN, individually and as Trustee of the RAIFMAN FAMILY REVOCABLE TRUST DATED 7/2/03, and GEKKO HOLDINGS, LLC, an Alaska limited liability company, dba GEKKO BREEDING AND RACING,

Plaintiffs,

v.

CLASSICSTAR, LLC, a Utah limited liability company, CLASSICSTAR FARMS, LLC, a Kentucky limited liability company, BUFFALO RANCH, a business entity form unknown, GEOSTAR CORPORATION, a Delaware corporation, S. DAVID PLUMMER, SPENCER D. PLUMMER III, TONY FERGUSON, THOMAS ROBINSON, JOHN PARROT, HANDLER, THAYER & DUGGAN, LLC, an Illinois Limited Liability Company, THOMAS J. HANDLER, KARREN, HENDRIX, STAGG, ALLEN & COMPANY, P.C., a Utah professional corporation f/k/a KARREN, HENDRIX & ASSOCIATES, P.C., a Utah professional corporation, TERRY L. GREEN, and DOES 1-1000 inclusive,

Defendants.

CASE NO. **C 07   2552**

**COMPLAINT**

1. **R.I.C.O.**
2. **COMMON LAW FRAUD**
3. **AIDING AND ABETTING COMMON LAW FRAUD**
4. **NEGLIGENT MISREPRESENTATION**
5. **BREACH OF CONTRACT**
6. **RESCISSION OF RELEASE**
7. **CONSTRUCTIVE TRUST**
8. **UNJUST ENRICHMENT**
9. **MONEY AND PROPERTY HAD AND RECEIVED**
10. **ACCOUNTING**
11. **CIVIL THEFT**
12. **AIDING AND ABETTING CIVIL THEFT**
13. **CONVERSION**
14. **NEGLIGENCE**

**DEMAND FOR JURY TRIAL**

ORIGINAL

1

COMES NOW, Plaintiffs, GREGORY R. RAIFMAN, individually and as Trustee of the RAIFMAN FAMILY REVOCABLE TRUST DATED 7/2/03, SUSAN RAIFMAN, individually and as Trustee of the RAIFMAN FAMILY REVOCABLE TRUST DATED 7/2/03, and GEKKO HOLDINGS, LLC, an Alaska limited liability company, ("Plaintiffs"), by its attorneys IDELL & SEITEL LLP, for its complaint against Defendants CLASSICSTAR, LLC, a Utah limited liability company, CLASSICSTAR FARMS, LLC, a Kentucky limited liability company, BUFFALO RANCH, a business entity form unknown, GEOSTAR CORPORATION, a Delaware corporation, S. DAVID PLUMMER, SPENCER D. PLUMMER III, TONY FERGUSON, THOMAS ROBINSON, JOHN PARROT, HANDLER, THAYER & DUGGAN, LLC, an Illinois Limited Liability Company, THOMAS J. HANDLER, KARREN, HENDRIX, STAGG, ALLEN & COMPANY, P.C., a Utah professional corporation f/k/a KARREN, HENDRIX & ASSOCIATES, P.C., a Utah professional corporation, TERRY L. GREEN, and DOES 1-1000 inclusive, states as follows:

## I.     INTRODUCTION AND NATURE OF THE CASE

1.      Acting together, during the times alleged herein, the Defendants transformed a thoroughbred horse breeding operation into a vehicle used to defraud unsuspecting individuals and other business owners of millions of dollars, including Plaintiffs herein.

2.      Operating in a number of states, Defendants aggressively marketed and sold thoroughbred Mare Lease Programs (the "Mare Lease Programs") to wealthy individuals interested in participating in the thoroughbred horse industry.

3.      On information and belief, the United States government, through the Internal Revenue Service Criminal Investigative Division (IRS-CID), is currently pursuing a criminal investigation into the activities of some or all of the Defendants relating to the Mare Lease Programs.

4.      As described by the Defendants, the Mare Lease Programs gave business owners ownership of thoroughbred breeding interests worth millions of dollars with the potential to own extremely valuable thoroughbred foals as a result of the breeding. In addition to ownership of the foals, Plaintiffs were offered the option of trading the Mare Lease interests for other supposedly valuable business opportunities, such as the Purchase and Exchange Program Plaintiffs entered into as alleged below. By participation in Defendants' programs, Plaintiffs believed that they had the opportunity to make at least a

thirty (30%) return on their initial business plan. If the programs touted by Defendants had proceeded as promised by Defendants, the Plaintiffs would have received large income amounts from the programs. Although Plaintiffs would have then been obligated to pay taxes on their gains, as an added incentive, Defendants represented that there were certain claimed and represented tax benefits associated with the Mare Lease Programs.

5.      However, on information and belief, Defendants deliberately sold Mare Lease Programs with a total value of tens of millions of dollars greater than the thoroughbred interests owned by Defendants could sustain and contrived to disguise this fact by purporting to substitute non-thoroughbred horse pairings for the thoroughbred interests promoted and promised to business owners.

6.      Based on the Defendants' fraudulent misrepresentations and other illegal actions in connection with the Mare Lease Programs, Plaintiffs bring this action against Defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("R.I.C.O."), 18 U.S.C. § 1961 *et seq.*, and other federal and state laws. Some Defendants engaged in such violations directly and some as aiders and abetters. The state law claims arise out of the same transaction or occurrence or series of transactions or occurrences that form the basis of the R.I.C.O. cause of action.

## II.    JURISDICTION AND VENUE

7.      At all times relevant to this Complaint, each of the Defendants was and is a "person" as that term is defined in 18 U.S.C. § 1961 and used in 18 U.S.C. § 1962.

8.      Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over the subject matter of this case because all or part of the claims arise from the Defendants' violations the United States Code, including, *inter alia,* the Racketeer Influenced Corrupt Organizations Act ("R.I.C.O."), 18 U.S.C. § 1961 *et seq.*

9.      This Court has supplemental jurisdiction over the subject matter of the claims asserted herein that arise under state law pursuant to 28 U.S.C. § 1367(a) and the doctrines of pendent and ancillary jurisdiction because the state law claims arise from a common nucleus of operative facts giving rise to the federal claims alleged this case.

10.     Additionally, even if there were no federal question jurisdiction, this Court has diversity jurisdiction over the case because each of the Plaintiffs is a citizen of the State of California, and each of the

Defendants is a citizen of a state other than California, including the States of Utah, Kentucky, Delaware, Florida and Illinois. The amount in controversy exceeds $75,000, exclusive of interest and costs.

11.    This Court has personal jurisdiction over each of the Defendants in this action pursuant to 18 U.S.C. § 1965(a), (b) and (d) and state law, as each transacts business in California or has minimum contacts with California, through the execution of contracts in California, through their involvement with, management of, or receipt of funds from Plaintiffs for the CLASSICSTAR Mare Lease Programs (the "Mare Lease Programs," discussed at length below), such that it is fair and reasonable for this Court to exercise jurisdiction over them.

12.    Venue is proper in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391, as one or more Defendants have agents or transacted their affairs within the District and conducted their fraudulent scheme, through use of the United States Mail or interstate wire communications in an illegal manner, to and from the District.

### III.    THE PLAINTIFFS

13.    Plaintiff GREGORY R. RAIFMAN is, and was at all times material hereto, a citizen and resident of the State of California with a residence located in Piedmont, California. He is a Trustee of the RAIFMAN FAMILY REVOCABLE TRUST DATED 7/2/03. GREGORY R. RAIFMAN sues in his individual capacity and as Trustee of the family trust.

14.    Plaintiff SUSAN RAIFMAN is, and was at all times material hereto, a citizen and resident of the State of California with a residence located in Piedmont, California. She is a Trustee of the RAIFMAN FAMILY REVOCABLE TRUST DATED 7/2/03. SUSAN RAIFMAN sues in her individual capacity and as Trustee of the family trust.

15.    Plaintiff GEKKO HOLDINGS, LLC, ("GEKKO") is, and was at all times material hereto, a limited liability company organized and existing under the laws of Alaska and is qualified to do business in the State of California. GEKKO does business as GEKKO HOLDINGS, LLC and as Gekko Breeding and Racing.

16.    Hereafter, GREGORY R. RAIFMAN, individually and as Trustee of the RAIFMAN FAMILY REVOCABLE TRUST DATED 7/2/03, SUSAN RAIFMAN, individually and as Trustee of the RAIFMAN FAMILY REVOCABLE TRUST DATED 7/2/03, and GEKKO HOLDINGS, LLC, an

1  Alaska limited liability company, when not referred to specifically and individually, shall be referred
2  to collectively herein as "Plaintiffs."  GREGORY RAIFMAN and SUSAN RAIFMAN are hereinafter
3  referred to as the "RAIFMANS."

4  ## IV.    THE DEFENDANTS

5      17.    Plaintiffs are informed and believe and, on that basis, allege that Defendant
6  CLASSICSTAR, LLC ("CLASSICSTAR") is and/or was, at all times material hereto, a limited
7  liability company organized and existing under the laws of the State of Utah and qualified to do
8  business in the State of Kentucky, with a registered agent located in Lexington, Kentucky.

9      18.    Plaintiffs are informed and believe and, on that basis, allege that Defendant
10  CLASSICSTAR FARMS, LLC ("CLASSICSTAR FARMS") is and/or was, at all times material
11  hereto, a limited liability company organized and existing under the laws of the State of Kentucky,
12  with a registered agent located in Lexington, Kentucky.

13      19.    Plaintiffs are informed and believe and, on that basis, allege that Defendant GEOSTAR
14  Corporation ("GEOSTAR") is a corporation organized and existing under the laws of the State of
15  Delaware, with a registered agent located in Wilmington, Delaware.  On information and belief,
16  Defendant GEOSTAR is a closely-held corporation that owns, indirectly through subsidiaries,
17  CLASSICSTAR.  On information and belief, three individuals, TONY FERGUSON, THOMAS
18  ROBINSON and JOHN PARROTT, own the primary interests in GEOSTAR, with some percentage of
19  GEOSTAR currently owned, or in the past owned, by S. DAVID PLUMMER.  On information and
20  belief, in addition to CLASSICSTAR, GEOSTAR owns approximately 15% of Gastar, a publicly
21  traded corporation.

22      20.    Plaintiffs are informed and believe and, on that basis, allege that Defendant BUFFALO
23  RANCH ("BUFFALO RANCH") is and/or was, at all times material hereto, a business entity form
24  unknown, with its principal place of business located at 37 N. Buffalo Road, Farmington, Utah 84025,
25  and engaged in the business of, *inter alia*, horse breeding.

26      21.    Plaintiffs are informed and believe and, on that basis, allege that Defendant S. DAVID
27  PLUMMER ("D. PLUMMER") is a citizen and resident of the State of Utah, with a residence or place
28  of business located at Kaysville, Utah.  On information and belief, D. PLUMMER was the founder of

5

1  CLASSICSTAR, and at all times material hereto was a co-owner, CEO, Director of Marketing and
2  President of CLASSICSTAR, and, along with his wife, Debby Plummer, is currently the co-owner of
3  BUFFALO RANCH.

4      22.    Plaintiffs are informed and believe and, on that basis, allege that Defendant SPENCER
5  D. PLUMMER III ("S. PLUMMER") is a citizen and resident of the State of Utah, with a residence or
6  place of business located at Farmington, Utah. On information and belief, at all times material hereto,
7  S. PLUMMER was the President of CLASSICSTAR and is the son of D. PLUMMER.

8      23.    Plaintiffs are informed and believe and, on that basis, allege that Defendant TONY
9  FERGUSON ("FERGUSON") is a citizen and resident of the State of Florida, with a residence or
10 place of business located at or near Tampa, Florida. On information and belief, at all times material
11 hereto, FERGUSON was a co-owner, Chairman and Managing Partner of CLASSICSTAR.

12     24.    Plaintiffs are informed and believe and, on that basis, allege that Defendant THOMAS
13 ROBINSON ("ROBINSON") is an individual whose residence is unknown. On information and
14 belief, at all times relevant hereto, ROBINSON was a manager and co-owner of CLASSICSTAR.

15     25.    Plaintiffs are informed and believe and, on that basis, allege that Defendant JOHN
16 PARROT ("PARROT") is an individual whose residence is unknown. On information and belief, at
17 all times relevant hereto, PARROT was a co-owner of CLASSICSTAR.

18     26.    Plaintiffs are informed and believe and, on that basis, allege that Defendant
19 HANDLER, THAYER & DUGGAN, LLC, an Illinois Limited Liability Company ("HANDLER
20 LAW FIRM") is a law firm and limited liability company organized and existing under the laws of the
21 State of Illinois. The HANDLER LAW FIRM is not licensed to practice law in the State of California.
22 On information and belief, at all times relevant hereto, no member of the HANDLER LAW FIRM was
23 licensed to practice law in the State of California.

24     27.    Plaintiffs are informed and believe and, on that basis, allege that Defendant THOMAS
25 J. HANDLER ("HANDLER") is a citizen and resident of the State of Illinois. On information and
26 belief, THOMAS J. HANDLER is an attorney and managing principal in the HANDLER LAW
27 FIRM. On information and belief, HANDLER is not licensed to practice law in the State of California.

28     28.    Plaintiffs are informed and believe and, on that basis, allege that Defendant KARREN,

HENDRIX, STAGG, ALLEN & COMPANY, P.C. f/k/a KARREN, HENDRIX & ASSOCIATES, P.C. ("KARREN, HENDRIX") is an accounting firm and professional corporation organized and existing under the laws of the State of Utah.  On information and belief, KARREN, HENDRIX is not licensed in the State of California.

29.    Plaintiffs are informed and believe and, on that basis, allege that Defendant TERRY L. GREEN ("GREEN") is a citizen and resident of the State of Utah.  On information and belief, TERRY L. GREEN is a Certified Public Accountant employed by Defendant KARREN, HENDRIX.  On information and belief, GREEN is not licensed in the State of California.

30.    Plaintiffs do not presently know the true names or capacities of those persons, firms, and entities named herein as DOES 1-1000, however, Plaintiffs are informed and believe and, on that basis, allege that each of the said DOE Defendants is responsible in some manner for the events and happenings herein alleged and for the damages and other injuries suffered and to be suffered by Plaintiffs herein.  Plaintiffs reserve the right to amend this Complaint when the true names and capacities of the said DOE Defendants have in fact been ascertained by Plaintiffs.  Plaintiffs are informed and believe and thereon allege that some of the DOE Defendants named herein are agents, employees or representatives of some of the other DOE Defendants and/or the named defendants and, in doing the things herein alleged, were acting within the course and scope of such agency and employment.

31.    Hereafter, CLASSICSTAR, CLASSICSTAR FARMS, BUFFALO RANCH, GEOSTAR, D. PLUMMER, S. PLUMMER, FERGUSON, ROBINSON, PARROT, HANDLER LAW FIRM, HANDLER, KARREN, HENDRIX, GREEN, and DOES 1-1000 inclusive, shall be referred to herein collectively as "Defendants."

32.    Hereafter, CLASSICSTAR, CLASSICSTAR FARMS, BUFFALO RANCH, GEOSTAR, D. PLUMMER, S. PLUMMER, FERGUSON, ROBINSON, PARROT, and DOES 501-1000 inclusive, when not referred to specifically and individually, shall be referred to herein collectively as the "CLASSICSTAR Defendants."

33.    Plaintiffs are informed and believe and, on that basis, allege that, in connection with the acts set forth herein, each of the Defendants acted as alleged herein, both for himself, herself, or itself,

and in concert with certain other Defendants, and that certain of the Defendants acted as an agents for each of the other Defendants, and were at all times acting within the course and scope of such agency, with the consent, authorization and/or ratification of the other Defendants, and in furtherance of a common scheme to defraud Plaintiffs.

34.    Plaintiffs are informed and believe, and on that basis allege, that certain of the Defendants are the alter egos of other Defendants, as follows:

a.    Plaintiffs are informed and believe and, on that basis, allege that Defendant GEOSTAR and an as yet undetermined number of the other Defendants and DOE Defendants, and each of them, wholly own and control each other, that certain individual Defendants are the sole stockholders, officers, and directors of GEOSTAR, that GEOSTAR is so controlled by said individual Defendants that the monies of GEOSTAR and of said individual Defendants are commingled and intermingled; that there is a unity of ownership and interest between them; that the credit of one is used for the credit of the other; that the obligations of said individual Defendants are paid by GEOSTAR; that GEOSTAR was formed and capitalized for a sum of money insufficient to meet reasonable requirements of GEOSTAR; that as a result of the foregoing, GEOSTAR is the instrumentality, conduit, adjunct and alter ego of said individual Defendants so as to make GEOSTAR and said individual Defendants the instrumentality, conduit, adjunct and alter ego of GEOSTAR, and said individual Defendants have managed and controlled GEOSTAR to avoid personal liability and to defraud creditors of said individuals and GEOSTAR and that unless the fiction of the separateness of said individuals from GEOSTAR and from each other is ignored, great injustice will result and fraud will be sanctioned, all to the irreparable damage and injury of Plaintiffs, and unless judgment in this action includes said individual Defendants and GEOSTAR, Plaintiffs will be unable to recover and enforce the claims and rights hereinafter referred to.

b.    Plaintiffs are informed and believe and, on that basis, allege that Defendant CLASSICSTAR and an as yet undetermined number of the other Defendants and DOE Defendants, and each of them, wholly own and control each other, that certain individual Defendants are the sole stockholders, officers, and directors of CLASSICSTAR, that CLASSICSTAR is so controlled by said individual Defendants that the monies of CLASSICSTAR and of said individual Defendants are

1  commingled and intermingled; that there is a unity of ownership and interest between them; that the

2  credit of one is used for the credit of the other; that the obligations of said individual Defendants are

3  paid by CLASSICSTAR; that CLASSICSTAR was formed and capitalized for a sum of money

4  insufficient to meet reasonable requirements of CLASSICSTAR; that as a result of the foregoing,

5  CLASSICSTAR is the instrumentality, conduit, adjunct and alter ego of said individual Defendants so

6  as to make CLASSICSTAR and said individual Defendants the instrumentality, conduit, adjunct and

7  alter ego of CLASSICSTAR, and said individual Defendants have managed and controlled

8  CLASSICSTAR to avoid personal liability and to defraud creditors of said individuals and

9  CLASSICSTAR and that unless the fiction of the separateness of said individuals from

10  CLASSICSTAR and from each other is ignored, great injustice will result and fraud will be

11  sanctioned, all to the irreparable damage and injury of Plaintiffs, and unless judgment in this action

12  includes said individual Defendants and CLASSICSTAR, Plaintiffs will be unable to recover and

13  enforce the claims and rights hereinafter referred to.

14          c.      Plaintiffs are informed and believe and, on that basis, allege that Defendant

15  BUFFALO RANCH and an as yet undetermined number of the other Defendants and DOE

16  Defendants, and each of them, wholly own and control each other, that certain individual Defendants

17  are the sole stockholders, officers, and directors of BUFFALO RANCH, that BUFFALO RANCH is so

18  controlled by said individual Defendants that the monies of BUFFALO RANCH and of said individual

19  Defendants are commingled and intermingled; that there is a unity of ownership and interest between

20  them; that the credit of one is used for the credit of the other; that the obligations of said individual

21  Defendants are paid by BUFFALO RANCH; that BUFFALO RANCH was formed and capitalized for

22  a sum of money insufficient to meet reasonable requirements of BUFFALO RANCH; that as a result

23  of the foregoing, BUFFALO RANCH is the instrumentality, conduit, adjunct and alter ego of said

24  individual Defendants so as to make BUFFALO RANCH and said individual Defendants the

25  instrumentality, conduit, adjunct and alter ego of BUFFALO RANCH, and said individual Defendants

26  have managed and controlled BUFFALO RANCH to avoid personal liability and to defraud creditors

27  of said individuals and BUFFALO RANCH and that unless the fiction of the separateness of said

28  individuals from BUFFALO RANCH and from each other is ignored, great injustice will result and

1   fraud will be sanctioned, all to the irreparable damage and injury of Plaintiffs, and unless judgment in

2   this action includes said individual Defendants and BUFFALO RANCH, Plaintiffs will be unable to

3   recover and enforce the claims and rights hereinafter referred to.

4           d.      Plaintiffs are informed and believe and, on that basis, allege that Defendant

5   CLASSICSTAR FARMS and an as yet undetermined number of the other Defendants and DOE

6   Defendants, and each of them, wholly own and control each other, that certain individual Defendants

7   are the sole stockholders, officers, and directors of CLASSICSTAR FARMS, that CLASSICSTAR

8   FARMS is so controlled by said individual Defendants that the monies of CLASSICSTAR FARMS

9   and of said individual Defendants are commingled and intermingled; that there is a unity of ownership

10  and interest between them; that the credit of one is used for the credit of the other; that the obligations

11  of said individual Defendants are paid by CLASSICSTAR FARMS; that CLASSICSTAR FARMS

12  was formed and capitalized for a sum of money insufficient to meet reasonable requirements of

13  CLASSICSTAR FARMS; that as a result of the foregoing, CLASSICSTAR FARMS is the

14  instrumentality, conduit, adjunct and alter ego of said individual Defendants so as to make

15  CLASSICSTAR FARMS and said individual Defendants the instrumentality, conduit, adjunct and

16  alter ego of CLASSICSTAR FARMS, and said individual Defendants have managed and controlled

17  CLASSICSTAR FARMS to avoid personal liability and to defraud creditors of said individuals and

18  CLASSICSTAR FARMS and that unless the fiction of the separateness of said individuals from

19  CLASSICSTAR FARMS and from each other is ignored, great injustice will result and fraud will be

20  sanctioned, all to the irreparable damage and injury of Plaintiffs, and unless judgment in this action

21  includes said individual Defendants and CLASSICSTAR FARMS, Plaintiffs will be unable to recover

22  and enforce the claims and rights hereinafter referred to.

23                          **V.     GENERAL ALLEGATIONS**

24          35.    This case represents a classic scheme to defraud. Acting together, the Defendants have

25  utilized a thoroughbred horse breeding operation as a vehicle to defraud unsuspecting business owners

26  of millions of dollars, including Plaintiffs herein. As a result of Defendants' activities, as alleged

27  herein, Plaintiffs have lost $3.4 million dollars plus pre-judgment interest and have suffered and will

28  suffer other damages as alleged herein.

COMPLAINT

## A. PARTICIPATION IN THE THOROUGHBRED INDUSTRY AND TAX TREATMENT

36.    Defendants represented to Plaintiffs that mare leases are an alternative method of participating in the thoroughbred industry. Rather than purchasing a mare directly, the participant leases the rights to the mare for a breeding season and then selects a stallion nomination to be used in connection with the leased mare, retaining or selling the foal that results from the breeding. Often, the arrangement also includes the price of board and insurance for the mare and/or foal.

37.    Defendants represented to Plaintiffs that mare leases are a recognized mode of participation in the thoroughbred industry.

38.    Defendants represented to Plaintiffs that participation in the equine industry has certain tax effects. Defendants represented that a taxpayer that is actively engaged in the horse business may be entitled to deduct, as ordinary and necessary business expenses, the amounts paid in connection with the business during any tax year. Defendants represented that such ordinary expenses can include insurance, board fees, stud fees, and either the depreciation of a mare purchased by the taxpayer or the cost of leasing a mare, if the taxpayer chooses to enter into a leasing program rather than make an outright purchase.

39.    Defendants represented to Plaintiffs that when the mare, whether leased or purchased, is bred to a stallion and produces a foal that is sold, the net revenue that is received by the taxpayer may be taxed as ordinary income rather than as capital gains.

40.    Defendants represented to Plaintiffs that because the cost of producing the foal was deducted as an ordinary expense, the taxpayer has no basis in the foal, making the proceeds, net of selling costs, taxable ordinary income.

41.    Defendants represented to Plaintiffs that when a taxpayer purchases a horse for breeding or racing purposes and retains ownership for two years before selling the horse, any gain on the sale receives capital gains treatment and is subject (in the highest tax bracket) only to 15% taxation, as opposed to the higher percentages applicable to ordinary income.

## B. DEFENDANTS' FRAUDULENT SCHEMES

42.    During the times alleged herein, the Defendants FERGUSON, D. PLUMMER, and S.

11

COMPLAINT

1   PLUMMER presided over and, in concert with the other Defendants, were associated with and conducted
2   the affairs of an enterprise which systematically and wrongfully obtained millions of dollars from
3   individuals and other business owners who participated in the Mare Lease Programs. The Defendants'
4   schemes were presented, marketed and sold to individuals and other business owners by the Defendants
5   using, *inter alia,* the United States mail and/or interstate wire communications. The Defendants
6   illegal conduct included mail fraud, wire fraud, misrepresentation and misappropriation of business
7   owners' funds and property.

8       43.    On information and belief, the thoroughbred mare leasing and boarding operation
9   currently controlled by CLASSICSTAR was originally run by an unrelated entity known as Classic
10  Breeders, LLC.

11      44.    On information and belief, Classic Breeders, LLC, an entity controlled by D. PLUMMER,
12  owned over 60 mares valued at approximately $6 million, in addition to a number of stallion nominations
13  available for use in connection with the Classic Breeders, LLC mares.

14      45.    On information and belief, Classic Breeders, LLC employed both D. PLUMMER and
15  his son, S. PLUMMER.

16      46.    On information and belief, through its subsidiaries, GEOSTAR, under FERGUSON's
17  control, subsequently acquired ownership of Classic Breeders, LLC and changed its name to
18  CLASSICSTAR, LLC.

19      47.    On information and belief, and as stated in CLASSICSTAR's marketing materials,
20  CLASSICSTAR's Mare Lease Business was formed in 1990 by D. PLUMMER.

21      48.    On information and belief, CLASSICSTAR continued to operate the thoroughbred
22  boarding and mare leasing business, in conjunction with its wholly-owned subsidiary CLASSICSTAR
23  FARMS.

24      49.    On information and belief, subsequent to the acquisition of control by D. PLUMMER,
25  GEOSTAR and FERGUSON, CLASSICSTAR began selling far more programs than the thoroughbred
26  interests owned by CLASSICSTAR could support. Upon information and belief, the CLASSICSTAR
27  Defendants began aggressively marketing the Mare Lease Programs to individuals with significant
28  incomes and assets, notwithstanding the fact that CLASSICSTAR only had available a limited number

of mares.

50.     In marketing its Mare Lease Programs, CLASSICSTAR distributed promotional materials both personally and through its agents, and through the United States mail and other interstate methods of communication.

51.     In promotional materials, D. PLUMMER marketed and represented the CLASSICSTAR Mare Lease Programs as an extremely profitable opportunity, with extremely high historical net cash returns on the initial cash outlay.

52.     In addition to the considerable monetary return on their business that Plaintiffs were promised and as represented by Defendants, CLASSICSTAR brochures also touted its representation of ownership of high quality thoroughbred mares and its ability to provide the "Ultimate Tax Solution, which converts ordinary income to long-term capital gains." It was represented that these were viable tax attributes that would pass review by the Internal Revenue Service.

53.     On information and belief, once CLASSICSTAR had generated interest in its programs through the use of its brokers, agents and others, including FERGUSON, D. PLUMMER and S. PLUMMER, CLASSICSTAR would make personal presentations regarding the financial income and tax benefits of purchasing a Mare Lease Program. D. PLUMMER would explain the operations of the Kentucky farms owned by CLASSICSTAR, while FERGUSON would address the purported financial benefits of the Mare Lease Programs.

54.     In marketing the fraudulent scheme, the Defendants explained that the Mare Lease Programs they offered for sale included several components.

55.     The primary component involved participation in the breeding of thoroughbred horses. On information and belief, participants would receive a list of CLASSICSTAR thoroughbred mares available for lease and a listing of stallion nominations owned by CLASSICSTAR to be used in connection with the mares.

56.     Once participants indicated their interest in the program, the Defendants would provide a book detailing the available thoroughbred mares and nominations. On information and belief, participants would make selections from the catalog and, in some instances, because they were generally novices to the horse breeding industry, and were learning the industry, participants would

13

COMPLAINT

1  rely on selections made by agents of CLASSICSTAR who had expertise in the area, after consultation
2  with participants.

3      57.    D. PLUMMER, FERGUSON, S. PLUMMER and other agents of CLASSICSTAR
4  represented that CLASSICSTAR owned the mares and the nominations from which participants
5  would choose their pairings, and that, assuming a successful breeding, the participants would own the
6  thoroughbred foals that would result.

7      58.    The Defendants, including D. PLUMMER, S. PLUMMER and FERGUSON, also
8  marketed the Mare Lease Programs and represented the programs as complying with IRS guidelines
9  for generating certain tax benefits. For example, Defendants unequivocally represented that, by
10 following their recommendations regarding participation in the Mare Lease Programs, participants
11 could properly deduct the value of the Mare Lease Programs as ordinary business expenses on their
12 income tax returns. Defendants were aided and abetted in those representations by the HANDLER
13 LAW FIRM and KARREN, HENDRIX, the law firm and accounting firm, respectively, who provided
14 written opinions included and used as part of Defendants' marketing materials, and, in the case of the
15 HANDLER LAW FIRM directly to Plaintiffs. HANDLER and GREEN, on behalf of the HANDLER
16 LAW FIRM and KARREN, HENDRIX, respectively, also personally made representations as to the
17 tax benefits of the Mare Lease Programs to SUSAN RAIFMAN during a CLASSICSTAR marketing
18 event in the Virgin Islands. At the time these representations were made by HANDLER LAW FIRM,
19 KARREN, HENDRIX, HANDLER and GREEN, Plaintiffs had no reason not to rely upon the
20 representations or to believe those representations to be anything other than accurate.

21     59.    The Defendants also represented that participants in the Mare Lease Program would
22 receive breeding rights (a lease) to a group of thoroughbred mares, along with the right to
23 use CLASSICSTAR's stallion nominations in connection with the leased mares, boarding for the
24 mares and foals and ownership of the resulting thoroughbred foals. In addition, it was represented that the
25 participants would be able to deduct the total cost of participating in the program as an ordinary and
26 necessary business expense and would ultimately receive capital gains treatment of the income resulting
27 from their activities. It was also represented that such tax treatment was within Internal Revenue regulations
28 and guidelines.

14

1    60.    The Defendants represented that the participants could participate in the Mare Lease

2  Program with an initial cash outlay amounting to only a portion of the value of the total mare

3  lease package.

4    61.    In the case of Plaintiffs, they made three (3) payments, November 26, 2003, December 22,

5  2003, and December 26, 2003, that made up the total of their initial business contribution.

6    62.    The Defendants also represented that the Mare Lease Programs included a feature

7  whereby the participants could defer the profit on the sale of their foals by exchanging their interests in

8  the foals or leases for other property or interests in other property.

9    63.    On information and belief, Defendants marketed the Mare Lease Programs and these

10  features to a number of potential participants, generating more than Five Hundred Million Dollars

11  ($500,000,000) in sales between 2000 and 2004.

12    64.    Plaintiffs now are informed and believe that the Defendants misrepresented virtually every

13  material aspect of the Mare Lease Programs.  Specifically, Defendants led Plaintiffs to believe that they

14  were receiving millions of dollars of interests in thoroughbred bloodstock, and that CLASSICSTAR had

15  structured the programs so that they qualified with Internal Revenue Service requirements for the

16  deductions taken by business owners.

17    65.    On information and belief, Defendants intentionally oversold the Mare Lease Programs,

18  knowing that CLASSICSTAR and/or CLASSICSTAR FARMS did not have ownership of

19  thoroughbred interests sufficient to fulfill the number of Mare Lease Programs sold.

20    66.    On information and belief, operating in a number of states, including California,

21  Defendants aggressively marketed and sold thoroughbred Mare Lease Programs to wealthy individuals

22  interested in participating in the thoroughbred horse industry.    Defendants touted the income

23  opportunities and tax advantages of the Mare Lease Programs, as well as the opportunity to convert the

24  leases into other types of business interests, to unsuspecting potential lessees, and further asserted that

25  there was "no downside."

26    67.    The Mare Lease Programs purportedly gave business owners ownership of

27  thoroughbred breeding interests worth millions of dollars as well as ownership of extremely valuable

28  thoroughbred foals born as a result of the breeding.  In inducing Plaintiffs (and others) to enter into the

15

COMPLAINT

1  Mare Lease Program, the Defendants specifically represented that:

2          a.      The Mare Lease Program was a viable business structure with a large income
3                  potential;

4          b.      In addition to the considerable income Plaintiffs would receive, there were
5                  favorable tax attributes which were within Internal Revenue Service guidelines
6                  and rules;

7          c.      Participation in the Mare Lease Program would qualify Plaintiffs as "farmers"
8                  engaged in the "farming business" for tax purposes;

9          d.      Participation in the Mare Lease Program was not a "hobby," but, in fact, a
10                 "business for profit," as those terms are defined by United States Dept. of
11                 Treasury Regulations;

12         e.      CLASSICSTAR would use their expertise in the horse breeding, training and
13                 racing business to help Plaintiffs qualify as "farmers" as that term is defined by
14                 the United States Dept. of Treasury regulations, in the business of horse
15                 breeding, training and racing;

16         f.      Capitalization by Plaintiffs in the amount of $3.4 million in the Mare Lease
17                 Program would appreciate substantially in value;

18         g.      By their participation in the Mare Lease Program, Plaintiffs would be allowed to
19                 deduct all ordinary and necessary expenses paid or incurred during a taxable
20                 year in carrying on their Mare Lease business;

21         h.      Breeding costs associated with the Mare Lease Program would be construed as
22                 the cost of "raising" horses, rather than the cost of "acquiring" horses, allowing
23                 Plaintiffs to choose between capitalizing the costs of the Mare Lease Program or
24                 deducting them;

25         i.      The Plaintiffs' participation in the Mare Lease Program would not be classified
26                 as a "capital asset" under the Internal Revenue Code;

27         j.      The Plaintiffs' participation in the Mare Lease Program would not be classified
28                 as a "passive activity" by the Internal Revenue Service;

16

COMPLAINT

1      k.    The "sham transaction doctrine" would have no application to Plaintiffs'
2            participation in the Mare Lease Program;

3      l.    The Mare Lease Program and the exchange program were legitimate businesses
4            that would result in substantial economic gain; and

5      m.    The tax treatment was within Internal Revenue Service guidelines and rules and
6            Plaintiffs would receive the tax treatment represented by Defendants.

7      68.    Plaintiffs are informed and believe and, on that basis, allege that in order to cover up the
8   fact that the same mares were being marketed and leased to multiple business participants, Defendants
9   encouraged lessees to exchange their interests in the Mare Lease Programs for other business
10  arrangements and opportunities with related entities or, in the case of Plaintiffs, for a business
11  opportunity involving other horses. The CLASSICSTAR Defendants represented that those further
12  business alternatives were "no lose" opportunities with a guaranteed upside for the Plaintiffs (and
13  others like them) a few years down the road. However, the CLASSICSTAR Defendants knew full
14  well that these transactions were unlikely to succeed, as the CLASSICSTAR Defendants were
15  overcommitted and would be unable to honor all of their contractual obligations when they came due.
16  In the case of Plaintiffs, FERGUSON and J. Russell Porter, Chairman, President and Chief Executive
17  Officer of Gastar Exploration, Ltd. ("Gastar"), a publicly traded company, owned by GEOSTAR
18  approached GREGORY R. RAIFMAN at the 2004 Kentucky Derby and attempted to convince him to
19  exchange his eight (8) thoroughbred mares for Gastar stock. FERGUSON and Porter represented that
20  this would be a "like kind" exchange. GREGORY R. RAIFMAN declined. Then, in January of 2005
21  CLASSICSTAR, through FERGUSON, contacted GREGORY R. RAIFMAN by telephone and
22  represented that CLASSICSTAR had a "no lose" business opportunity for Plaintiffs. The offer was to
23  exchange twenty (20) performance quarter horse breeding pairs for the Plaintiffs' interests in their
24  eight (8) thoroughbred mare leases. FERGUSON represented that this particular trade was only being
25  offered to a select group of participants in the Mare Lease Program, which FERGUSON described as
26  those business owners who had contributed to the most valuable Mare Lease interests. The Plaintiffs
27  now know that the purported quarter horse foals do not exist, have never existed and will never exist.
28  Plaintiffs did not discover that the horses did not exist, and therefore did not discover Defendants'

17

1 | fraud, until the Fall of 2006.

2 |     69.    Defendants were aided and abetted in their fraudulent activities by the HANDLER
3 | LAW FIRM, HANDLER and various other lawyer members of that firm, KARREN, HENDRIX, an
4 | accounting firm, GREEN, and various other members of that firm, who asserted the marketing and
5 | promotion of the scheme by purporting to provide tax and other opinions regarding the validity of the
6 | Mare Lease Programs. The opinions of these professionals provided legitimacy for the overall scheme.
7 | Without the overlay of these professionals adding legitimacy to the programs, Defendants would have
8 | been unable to induce Plaintiffs and others to participate in the programs. The role of these
9 | professionals in the marketing gave the impression of viability and lawfulness of the programs and to
10 | assist in promoting and marketing the programs; the participation, opinions and presentations of the
11 | lawyers and accountants were instrumental in the decision of Plaintiffs and others to participate and
12 | continue such participation including participation in the Purchase and Exchange Program.

13 |     70.    Subsequent to the participation in the subject transactions by Plaintiffs, Plaintiffs were
14 | notified by the Internal Revenue Service ("IRS") of an audit. That audit process has not been
15 | completed, but a notice of proposed disallowance was issued on March 23, 2007. The IRS has notified
16 | Plaintiffs that the tax benefits of the programs, as represented by Defendants, are proposed to be
17 | disallowed. Plaintiffs will suffer additional damages from the results of that tax audit in the form of
18 | potential additional taxes, interest, penalties and costs of defense. Plaintiffs are defending the IRS
19 | audit, the outcome of which cannot be predicted.

20 |     71.    Based on the Defendants' fraudulent misrepresentations and other illegal actions in
21 | connection with the Mare Lease Programs, Plaintiffs bring this action against Defendants to recover all
22 | damages suffered by Plaintiffs. The Defendants engaged in such acts directly and/or as aiders and
23 | abetters.

24 |     **C. MARE LEASE INTERESTS**

25 |     72.    As alleged above, mare leases represent an alternative method of participating in the
26 | thoroughbred industry. Rather than acquiring a mare directly by way of purchase, the participant
27 | leases the rights to the mare for a breeding season and then selects a stallion to be used in connection
28 | with the leased mare, retaining or selling the foal that results from the breeding. Often, the

1  arrangement also includes the price of board for the mare and/or foal and insurance.

2      73.   The CLASSICSTAR Defendants, the HANDLER LAW FIRM and KARREN,
3  HENDRIX represented that participation in the equine industry had certain tax effects.   It was
4  represented that a taxpayer that is actively engaged in the horse business may be entitled to deduct as
5  ordinary and necessary business expenses the amounts paid in connection with the business during any
6  tax year.  It was represented that such ordinary expenses can include insurance, board fees, stud fees,
7  and either the depreciation of a mare purchased by the taxpayer or the cost of leasing a mare, if the
8  taxpayer chose to enter into a leasing program rather than make an outright purchase.  As alleged
9  above, the represented tax benefits have now been proposed to be disallowed by the IRS in an audit of
10 Plaintiffs' tax returns.

11               **D.  MARE LEASE PROGRAM AND PLAINTIFFS**

12     74.   On information and belief, Defendants FERGUSON and D. PLUMMER, presided over
13 and, in concert with, or aided and abetted by, the other Defendants, were associated with and
14 conducted the affairs of an enterprise which systematically and wrongfully obtained hundreds of
15 millions of dollars from individuals and other business owners who participated in Mare Lease
16 Programs.   The Defendants' schemes were presented, marketed and sold to individuals and other
17 business owners by the Defendants using, *inter alia*, the United States mail and/or interstate wire
18 communications.  The Defendants' illegal conduct included mail fraud, wire fraud, misrepresentation
19 and misappropriation of business owners' funds and personal property.

20     75.   On information and belief, in marketing the Mare Lease Programs, CLASSICSTAR and
21 other Defendants distributed promotional materials both personally, through their agents, and through
22 the United States mail and other interstate methods of communication.   On information and belief,
23 CLASSICSTAR offered generous payments to third parties in order to induce the sale of its programs.
24 Plaintiffs were introduced and sold the Mare Lease Programs by Private Consulting Group, Inc.
25 ("PCG"), including Robert L. Keys, President and CEO of PCG, who, on information and belief,
26 received significant undisclosed fees for the referral.  Because of PCG's status as a broker-dealer and
27 registered investment advisor, this association and referral added an additional aura of legitimacy to
28 the program.  PCG had a local Marin County affiliate, Ramos Financial Corporation d/b/a Private

Capital Management, Inc. ("PCM"), a registered investment advisor. PCM and Joe Ramos were Plaintiffs' investment advisors. The role of C. Joseph Ramos, the President of PCM as Plaintiffs' investment advisor added a further aura of legitimacy to the program. According to the Defendants, the contribution amount for the Mare Lease Program would equal the total value of mare leases, stallion services and pre-paid boarding provided in connection with the mare leases.

76.     Defendants represented that, as another component of the Mare Lease Program, participants could make like-kind exchanges of their interest in the Mare Lease Program for interests in other businesses or property. In the case of Plaintiffs, in May of 2004 FERGUSON presented to Plaintiffs the opportunity to exchange their eight (8) thoroughbred mares for Gastar stock. Later, Plaintiffs were steered to an exchange program to exchange their mare leases for horses known as "performance quarter horses" (the "Purchase and Exchange Program"). According to Defendants' representations regarding the Purchase and Exchange Program, Plaintiffs would own the performance horses for a specified period of time and would be paid interest at the rate of four percent (4%) per quarter on their initial contribution (here, $3.4 million dollars), and then would be entitled to sell the performance quarter horses back to CLASSICSTAR for the full amount of the contribution plus a "put price" twenty percent (20%) higher than the original contribution, by a date certain, resulting in a premium sale over the contribution amount and a guaranteed thirty percent 30% return. In other words, a "no lose" business transaction.

77.     FERGUSON, on information and belief, knowing that such performances horses never existed, personally contacted Plaintiffs in early January of 2005 about exchanging their right to the eight (8) thoroughbred foals for twenty (20) performance quarter horses. FERGUSON induced Plaintiffs to exchange their rights in the eight (8) thoroughbred foals for twenty (20) performance horses based on the following representations. Plaintiffs agreed to the transaction based on the representations of FERGUSON that the exchange was bona fide and that Plaintiffs would receive interest at the rate of four percent (4%) per calendar quarter (here, $34,000.00 per calendar quarter), and a "put" for an amount twenty percent (20%) higher than the original contribution amount exercisable on July 1, 2007. The "put" price would have been $4,080,000.00. In other words, Plaintiffs would receive a total thirty percent (30%) return on their original contribution to the Mare

20

1   Lease Program. Plaintiffs discovered in the Fall of 2006 that these twenty (20) performance quarter

2   horses do not exist, have never existed and will never exist. In addition, Defendants have defaulted on

3   their financial obligations, have admitted that there are no performance quarter horses and it is clear

4   that Defendants cannot and will not deliver on this "put".

## E. SOLICITATION OF PLAINTIFFS

6   78.   CLASSICSTAR represented to the Plaintiffs that D. PLUMMER was a "leading expert

7   on horse and farm taxation" who had worked with the United States House of Representatives Ways

8   and Mean Committee in drafting the 1986 Tax Reform Act.

9   79.   Defendants promised Plaintiffs the opportunity to make at least a thirty (30%) return on

10  their initial business plan. If the program had proceeded as promised by Defendants, the Plaintiffs would

11  have received a large income from the program, and they would have been obligated to pay large taxes,

12  however, as an additional benefit of the program, in numerous pieces of correspondence received from

13  CLASSICSTAR, including several items signed by S. PLUMMER, the "tax benefits" of the Mare

14  Lease Program were touted. In fact, CLASSICSTAR's marketing materials claim that the mare lease

15  business is "The Ultimate Tax Solution!"

16  80.   HANDLER, of the HANDLER LAW FIRM, and GREEN, of KARREN, HENDRIX,

17  aided and abetted the other Defendants in their conduct as alleged herein and, among other acts,

18  attended a marketing and introduction seminar in the Virgin Islands and spoke to SUSAN RAIFMAN

19  about the income and tax benefits of the Mare Lease Program.

20  81.   The Plaintiffs did everything that they were told to do by Defendants, including paying

21  $3.4 Million Dollars into the Mare Lease Program.

## F. THE 2003 TRANSACTION WITH CLASSICSTAR

23  82.   CLASSICSTAR, through D. PLUMMER, S. PLUMMER and FERGUSON,

24  represented that it owned sufficient thoroughbred interests to justify the cost of the Mare Lease

25  Program and that Plaintiffs would own any foals resulting from its pairings and be free to sell them or

26  hold and train them as they wished.

27  83.   Relying on the representations of Defendants as set forth above regarding the viability

28  and legitimacy of the Mare Lease Program, the RAIFMANS, as Trustees of the RAIFMAN FAMILY

1  REVOCABLE TRUST DATED 7/2/03, executed a letter agreement entitled "2003 Letter of
2  Understanding," effective November 20, 2003, committing them to a schedule of payments and to
3  executing the actual mare lease and boarding agreements after consultation with CLASSICSTAR
4  regarding the particular thoroughbred pairings.

5     84.   Shortly thereafter, the Plaintiffs directed their investment advisors to wire a payment of
6  Three Hundred Forty Thousand Dollars ($340,000) to CLASSICSTAR. The Plaintiffs continued to
7  make payments and incur obligations totaling $3.4 million, the last payment being made on January 5,
8  2004.   The payments were made directly by Plaintiffs' investment advisors, on behalf of the
9  RAIFMANS, to CLASSICSTAR.

10    85.   On or about December 31, 2003, the RAIFMANS, as Trustees of the RAIFMAN
11 FAMILY REVOCABLE TRUST, DATED 7/2/03, executed the Mare Lease and Breeding Agreement,
12 Foal Agreement, and Boarding Agreement, included among the documentation for the Mare Lease
13 Programs. By this time, in accordance with the terms of the letter agreement, Plaintiffs had already
14 transferred Three Million Four Hundred Thousand Dollars ($3,400,000) to CLASSICSTAR.

15    86.   On or about August 19, 2004, the RAIFMANS, as Trustees of the RAIFMAN FAMILY
16 REVOCABLE TRUST, DATED 7/2/03, assigned all right, title, and interest in the Mare Lease
17 Program to GEKKO.

18    87.   The Leases specifically warranted that CLASSICSTAR owned the mares involved.

19    88.   The Defendants, including D. PLUMMER, S. PLUMMER and FERGUSON,
20 misrepresented virtually every material aspect of the Mare Lease Program.   Specifically, the
21 Defendants led Plaintiffs to believe that they were receiving millions of dollars of interests in
22 thoroughbred bloodstock, and that CLASSICSTAR had structured the Programs so that they qualified
23 with Internal Revenue Service requirements for the deductions taken by business owners.

24    89.   On information and belief, Defendants intentionally oversold the Mare Lease Programs,
25 knowing that CLASSICSTAR did not have ownership of thoroughbred interests sufficient to fulfill the
26 Mare Lease Programs or the number of Mare Lease Programs sold.

27    90.   On information and belief, in order to conceal this intentional policy of overselling the
28 Mare Lease Programs and to further their fraudulent scheme, the Defendants contrived to offer

1 alternative business models, such as the Purchase and Exchange Program in which Plaintiffs
2 participated.

3 91. On information and belief, because participants, such as Plaintiffs, would not own the
4 expected number of thoroughbred foals at the end of the breeding season due to the overselling of
5 Mare Lease Programs, Defendants knew that participants could not possibly achieve the rate of return
6 represented.

7 92. Even if participants elected one of the alternative business models and contributed all or
8 a portion of the value in their Mare Lease interests to one of these alternative business models, the
9 ownership interest in that alternative business model would lack the represented value because that
10 business was valueless and fraudulent. However, the existence of these alternative business models
11 was designed to and did disguise the lack of adequate thoroughbred mares to sustain the Mare Lease
12 Programs and further Defendants' fraud and non-disclosures.

13 ## G. THE 2005 PURCHASE AND EXCHANGE PROGRAM

14 93. As alleged above, in order to conceal the fact that it did not have sufficient interests in
15 thoroughbred mares to match the number of 2003 Mare Lease interests it had sold, CLASSICSTAR,
16 through FERGUSON, approached GREGORY R. RAIFMAN at the 2004 Kentucky Derby and
17 attempted to convince him to exchange his eight (8) thoroughbred mares for stock in Gastar.
18 GREGORY R. RAIFMAN declined. Then, in early 2005, FERGUSON, on behalf of CLASSICSTAR,
19 persisted in attempting to convince the RAIFMANS to exchange their interests for a different business
20 model. FERGUSON contacted the RAIFMANS and offered to trade Plaintiffs' 2003 Mare Lease
21 interests for another business opportunity. CLASSICSTAR, through FERGUSON, offered to
22 exchange the Mare Lease interests for ownership interests in performance quarter horses.
23 CLASSICSTAR, through FERGUSON, also offered a "put" option, effective July 1, 2007, whereby
24 CLASSICSTAR would repurchase the performance horse interests for the value paid plus twenty
25 percent (20%). FERGUSON and CLASSICSTAR guaranteed the RAIFMANS an overall thirty
26 percent (30%) return if they participated in the Purchase and Exchange Program. Thus, FERGUSON
27 and CLASSICSTAR represented the exchange as a "can't lose" or "no lose" situation, which would
28 garner Plaintiffs promised locked-in profits and preserve the represented tax benefits of the initial

COMPLAINT

1 | program.

2 | 94. FERGUSON and CLASSICSTAR further advised Plaintiffs that this exchange was a
3 | "like kind exchange" for purposes of the Internal Revenue Service.

4 | 95. Relying upon CLASSICSTAR's representations, including but not limited to the direct
5 | representations of FERGUSON, Plaintiffs entered into the Purchase and Exchange Agreement dated
6 | on or about January, 2005.

7 | 96. On information and belief, CLASSICSTAR did not own any interests in the
8 | performance quarter horses it agreed to transfer to Plaintiffs. As it turns out, and as Plaintiffs
9 | discovered in the Fall of 2006, the horses did not even exist. Despite the fact that he signed the
10 | Purchase and Exchange Agreement on behalf of CLASSICSTAR, D. PLUMMER did not disclose the
11 | true facts regarding the performance quarter horses to the Plaintiffs.

12 | 97. Rather, CLASSICSTAR, FERGUSON, S. PLUMMER and D. PLUMMER represented
13 | that by virtue of the "put price" option in the Purchase and Exchange Agreement, exercisable on July
14 | 1, 2007, Plaintiffs would receive the entire value for the 2004 Mare Lease Program, plus twenty
15 | percent (20%) interest, from CLASSICSTAR in addition to promised four percent (4%) interest
16 | payments each quarter, resulting in a total thirty percent (30%) return on their original contribution.

17 | 98. CLASSICSTAR never transferred ownership of the performance horse interests to
18 | Plaintiffs and, of course, could not and cannot, because the horses do not exist.

19 | 99. Defendants made one payment to Plaintiffs of interest on June 20, 2006 and thereafter
20 | have made no payments. All demands for performance have gone unanswered. On information and
21 | belief, CLASSICSTAR does not have sufficient funds or assets to honor all of its future obligations to
22 | investors in the Mare Lease Programs and the Purchase and Exchange Program and all of Plaintiffs'
23 | demands and efforts to be made whole have been futile. Defendants' conduct constitutes an
24 | anticipatory repudiation of the sums due from CLASSICSTAR under the Purchase and Exchange
25 | Program.

26 | 100. On information and belief Defendants used a portion of the fraudulently obtained funds
27 | to support the activities of CLASSICSTAR, CLASSICSTAR FARMS, GEOSTAR and/or their
28 | affiliates, which accepted the funds with knowledge of the fraud and aided and abetted with the other

24

1 | Defendants to conceal the true operation of the Mare Lease Programs.

2 | 101. The use of these funds in operation of the farms and the marketing of the Mare Lease
3 | Programs facilitated the continuation of the fraudulent scheme and enabled the Defendants to defraud
4 | Plaintiffs.

5 | 102. The HANDLER LAW FIRM, HANDLER, KARREN, HENDRIX and GREEN
6 | provided legitimacy for the scheme, were a necessary and essential part of the scheme, and aided and
7 | abetted the other Defendants in their fraudulent activities.

8 | 103. Using these fraudulent schemes, the Defendants obtained $3.4 million from Plaintiffs
9 | and Plaintiffs have been deprived of these funds and the use of those funds as well as suffering other
10 | damages all as alleged herein.

11 | ## VI.   THE R.I.C.O. PREDICATE ACTS

12 | 104. Defendants conspired to and did engage in mail and wire fraud in violation of 18 U.S.C.
13 | §1341 or §1343 by using, or causing to be used, the United States mail or interstate wire
14 | communications in furtherance of and for the purposes of executing schemes to defraud and to obtain
15 | and maintain money by false pretenses. Each use of the mails or interstate wire communications in
16 | furtherance of and for the purposes of executing the schemes constitutes a separate and distinct
17 | violation of 18 U.S.C. § 1341 and/or 18 U.S.C. § 1343.

18 | 105. Defendants used mail and wire communications to collect the proceeds of the fraudulent
19 | scheme to induce Plaintiffs to forward payments to them, to forestall Plaintiffs' inquiry into the scheme
20 | and to induce Plaintiffs' participation.

21 | 106. Defendants made misrepresentations using the United States mail and interstate wire
22 | communications with the intent to defraud Plaintiffs, and Plaintiffs in fact reasonably relied upon such
23 | misrepresentations, including those relating to the nature of the Mare Lease Programs, to their
24 | detriment.

25 | 107. Several, but not all, specific examples of the use of mail and interstate wire
26 | communications are as follows:

27 |       a.   On or about November 20, 2003, S. PLUMMER, on behalf of CLASSICSTAR,
28 |          who were then located in Utah, mailed a 2003 Letter of Understanding to the

25

RAIFMANS, who were located in Piedmont, California.

b.  On January 2, 2004, Mindi L. Morishita of CLASSICSTAR emailed the 2003 Mare Lease and Breeding Agreement, Schedule A, Boarding Agreement, Foal Agreement and Nominee Agreement to GREGORY R. RAIFMAN and SUSAN RAIFMAN, who were located in Piedmont, California, and provided directions to the RAIFMANS to utilize CLASSICSTAR's Federal Express account to overnight the signed agreements to CLASSICSTAR.

c.  On August 11, 2004, Mindi L. Morishita of CLASSICSTAR mailed to the RAIFMANS, who were located in Piedmont, California, a status report of their 2003 Mare Lease Business.

d.  On February 21, 2005, Nick Plummer of CLASSICSTAR in Kentucky mailed correspondence regarding foal corrective surgery to the RAIFMANS in Piedmont, California.

e.  On February 22, 2005, Mindi L. Morishita of CLASSICSTAR mailed the RAIFMANS, who were located in Piedmont, California, a congratulatory letter on the birth of a foal from two of the RAIFMANS' horses.

f.  On or about November 26, 2003, December 22, 2003, and December 26, 2003, CLASSICSTAR received wire transfers of funds from Plaintiffs' investment advisors on behalf of Plaintiffs.

g.  On January 22, 2004, February 23, 2004, March 26, 2004 and June 17, 2004, Mindi Morishita of CLASSICSTAR in Kentucky sent correspondence to the RAIFMANS in Piedmont, California.

h.  On August 11, 2004, Mindi Morishita of CLASSICSTAR mailed a Status Report to the RAIFMANS and GEKKO who were located in Piedmont, California.

i.  On March 2, 2005, Plaintiffs' investment advisors in California, on behalf of the Plaintiffs, faxed the executed January 2005 Purchase and Exchange Agreement to Jim Overton at GEOSTAR Corporation.

26

108.    Defendants also utilized mail and interstate wire communications to solicit participation by other investors in the CLASSICSTAR Mare Lease Program as well as to transfer participants to alternative businesses.

## FIRST CLAIM FOR RELIEF

[R.I.C.O. -- Against All Defendants and DOES 1-1000]

109.    The allegations of paragraphs 1-108 are incorporated by reference as if fully set forth herein.

110.    At all times relevant to this Complaint, the Defendants, and each of them, were "persons" as that term is defined in 18 U.S.C. § 1961(3) and as used in 18 U.S.C. § 1962. The corporate and entity Defendants engaged in a pattern of racketeering activity through persons and legal entities beyond their control, such as the HANDLER LAW FIRM, HANDLER, KARREN, HENDRIX, GREEN, PCG, Robert L. Keys, PCM and C. Joseph Ramos.

111.    At all times relevant to this Complaint, all of the Defendants constituted an association in fact and therefore are an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) and as used in 18 U.S.C. § 1962 (hereinafter the "Mare Leasing Marketing Enterprise"). At all times relevant to this Complaint, the Mare Leasing Marketing Enterprise had continuity of structure and personnel, a common or shared purpose and an ascertainable structure distinct from that inherent in the pattern of racketeering activity. Further, the Mare Leasing Marketing Enterprise was created, existed as an ongoing association engaged in or affecting interstate commerce, and had an ascertainable structure apart from the pattern of racketeering activity alleged in this Complaint. The members of the Mare Leasing Marketing Enterprise were linked together by more than their participation in the same pattern of racketeering activity alleged in this Complaint. In addition to Defendants named herein, the Mare Leasing Marketing Enterprise included the activities of PCG and its principals, including but not limited to Robert L. Keys, and PCM, Ramos Financial Corporation and its principals, including but not limited to C. Joseph Ramos, who promoted and sold interests in the Mare Lease Programs to Plaintiffs. Other lawsuits alleging R.I.C.O. violations have been filed including in the United States District Court for the Eastern District of Kentucky, Lexington Division, being action No. 06-243-JMH, entitled *West Hill Farms, LLC v. ClassicStar, LLC, et al.*, and in the United States District Court for the Eastern

District of Pennsylvania, being action No. CV-07-0163, entitled *J & L Canterbury Farms, LLC v. ClassicStar, LLC et al.*, also alleging racketeering activity involving most of these same Defendants and other parties.

112.     At all times relevant to this Complaint, the Defendants engaged in or affected interstate commerce by transacting business in numerous states and across state lines. Further, CLASSICSTAR held several of their participant meetings in the Virgin Islands. Specifically, HANDLER, of the HANDLER LAW FIRM, GREEN, of KARREN, HENDRIX, D. PLUMMER and FERGUSON conducted seminars at these Virgin Islands meetings, of which Plaintiffs were attendees.

113.     Each of the Defendants was associated with or employed by the Mare Leasing Marketing Enterprise and each aided and abetted and/or conspired to, and did as part of that employment or association, conduct or participate in the conduct of the affairs of the Mare Leasing Marketing Enterprise through engaging in a pattern of racketeering activity.

114.     Each of the Defendants operated or managed the Mare Leasing Marketing Enterprise itself by conducting or participating, directly or indirectly, in the conduct of the enterprise's affairs.

115.     Each of the Defendants conspired to, and did, derive or receive income from a pattern of racketeering activity, some part of which was used to operate the Mare Leasing Marketing Enterprise, enabling the Mare Leasing Marketing Enterprise to defraud Plaintiffs, as set forth herein.

116.     As a whole, Defendants acted in concert, with specific, well-defined roles, in the Mare Leasing Marketing Enterprise to achieve the common goal of defrauding participants, such as Plaintiffs, into making payments for the misrepresented Mare Leasing Programs and then switching Plaintiffs into alternative business models with related entities, such as through the Purchase and Exchange Program. CLASSICSTAR, D. PLUMMER, S. PLUMMER and FERGUSON offered the Mare Leases and purported to provide information regarding the legitimacy of the businesses. HANDLER, the HANDLER LAW FIRM, GREEN and KARREN, HENDRIX purported to provide legal and accounting opinions as marketing and promotional support, both in writing and at various CLASSICSTAR sponsored events, to support and provide legitimacy to the Mare Lease Programs and thus purported to provide a cloak of legitimacy to the programs. HANDLER LAW FIRM and KARREN, HENDRIX assisted in marketing and promoting the program to participants apart from

28

1   their respective legal and accounting roles.

2   117.   On information and belief, all of the Defendants encouraged the switch to alternative
3   business models in order to continue the scheme and to further delay discovery of the fact that there
4   were insufficient mares to justify the number of Mare Lease Programs being sold and that Defendants
5   had intentionally oversold the Mare Lease Programs. In addition, the Purchase and Exchange Program was
6   a complete fraud in as much as the performance quarter horses did not exist, do not exist, and have never
7   existed.

8   118.   These acts of Defendants, including the conduct of the affairs of the Mare Leasing
9   Marketing Enterprise through a pattern of racketeering activity, took place over a period of at least four
10  (4) continuous years, were not isolated events and included multiple acts of mail fraud, wire fraud and
11  violations of state law.

12  119.   Defendants have continuously engaged in criminal activities, including but not limited
13  to mail and wire fraud, as part of their overall scheme for at least four (4) years and will continue
14  indefinitely unless prevented. The fraudulent representations and conduct of Defendants is set forth in
15  Paragraphs 128 and 130, which are incorporated by reference.

16  120.   The Defendants' pattern of racketeering activity, including acts of mail fraud and wire
17  fraud, have occurred within the relevant time periods outlined in 18 U.S.C. § 1961(5).

18  121.   Through their operation and management of the enterprise, the Defendants have made
19  or caused to be made or distributed communications by United States mail which included
20  misrepresentations of material fact regarding the Mare Leasing Programs and Purchase and Exchange
21  Program and have made or caused to be made interstate wire transfers as a result of such
22  misrepresentations.

23  122.   By virtue of these and similar communications occurring over at least the past four (4)
24  years, the Defendants have engaged in, and are continuing to engage in, an uninterrupted series of
25  predicate acts of mail and wire fraud that were related to one another in furtherance of the fraudulent
26  schemes.

27  123.   By conducting or participating, directly or indirectly, in the conduct of the Mare Lease
28  Marketing Enterprise through a pattern of racketeering activity, and conspiring to conduct and

29

1   participate in such racketeering activity, the Defendants, and each of them, have violated both 18

2   U.S.C. § 1962 (c) and 18 U.S.C. § 1962 (d) of the R.I.C.O. statute.

3       124.    As a direct and proximate result of Defendants' conduct, as set forth herein, including

4   Defendants' conduct of the affairs of and participation in the Mare Lease Marketing Enterprise,

5   Plaintiffs were injured in their business and property and have suffered and continue to suffer injuries,

6   including but not limited to the amounts of their contribution, business costs, interest and legal

7   expenses. Plaintiffs' damages include, but are not limited to, the $3.4 million paid, plus pre-judgment

8   interest, additional damages arising from the ongoing Internal Revenue audit and any and all other

9   consequential and compensatory damages proximately caused by Defendants' conduct, as alleged

10  herein.

11      125.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from the Defendants,

12  jointly and severally, treble damages, their costs and reasonable attorneys' fees.

13      WHEREFORE, Plaintiffs pray for relief as follows:

14      a.    For damages in the amount of $3.4 million, or more, according to proof;

15      b.    For further compensatory damages, according to proof, including but not limited to

16          damages arising form the ongoing tax audit;

17      c.    For pre-judgment interest on damages, according to proof;

18      d.    For treble damages pursuant to 18 U.S.C. § 1964(c);

19      e.    For attorneys' fees;

20      f.    For costs of suit;

21      g.    For such other and further ruling as the Court deems just and proper in the premises.

22                          **SECOND CLAIM FOR RELIEF**

23              [COMMON LAW FRAUD -- Against All Defendants and DOES 1-1000]

24      126.    The allegations of paragraphs 1-125 are incorporated by reference as if fully set forth

25  herein.

26      127.    In order to induce Plaintiffs to participate in the Mare Lease Programs, and with the

27  intent that Plaintiffs rely on their representations, Defendants made certain misrepresentations of

28  material fact and omitted to disclose certain material facts which they had a duty to disclose.

30

128.   As alleged above, from mid-2003 on, in promotional materials and in presentations, Defendants made representations to Plaintiffs as alleged, including but not limited to as set forth in paragraphs 36, 37, 38, 39, 40, 41, 51, 52, 53, 54, 57, 58, 59, 60, 62, 66, 67, 68, 70, 73, 75, 76, 77, 78, 79, 80, 82, 83, 87, 88, 93, 94, 95 and 97 above.

129.   Defendants KARREN, HENDRIX, HANDLER LAW FIRM, HANDLER, GREEN and certain of DOES 1-1000 knew that the representations of other Defendants and their own representations regarding the validity of the Mare Lease Programs were false, or were made with reckless disregard as to the truth or falsity thereof, and made their personal presentations and gave their opinions knowing they were false or were made with reckless disregard as to the truth or falsity thereof.

130.   The CLASSICSTAR Defendants further represented through FERGUSON that Plaintiffs should exchange their Mare Lease Program for the Purchase and Exchange Program and that if they did so there were guaranteed upsides, as alleged above in Paragraphs 66, 68, 76, 77, 93 and 94 above.

131.   Each of the foregoing representations was false when it was made and each of the omitted facts were facts which Defendants had a duty to disclose.

132.   Defendants knew each representation was false or made the representations with reckless disregard as to the truth or falsity of the representations, in that they knew they had no basis for the representations, or intentionally failed to disclose material facts. With regard to the Purchase and Exchange Program, the representations were made with full knowledge that the entities responsible for providing the guaranteed upsides did not have sufficient property or funds to honor all of their contractual obligations to participants like the Plaintiffs. Each of the representations were made with the intent to induce Plaintiffs to rely on the representations.

133.   Plaintiffs reasonably and justifiably relied on the representations to their detriment by, *inter alia*, their agreement to participate in Mare Lease Programs and their contribution to the same. In addition, the Plaintiffs would not have agreed to enter into the Purchase and Exchange Program but for the representations of the Defendants.  Plaintiffs also reasonably and justifiably relied on the representations of Defendants in exchanging their Mare Lease Programs for other businesses, *i.e.*, the non-existent performance quarter horses.

134. Plaintiffs have suffered damages as a direct and proximate result of their reasonable reliance on the misrepresentations of Defendants.

135. Plaintiffs are entitled to recovery of all damages proximately caused by the conduct of Defendants, including but not limited to the amount of $3.4 million or more, according to proof, plus pre-judgment interest. Plaintiffs are entitled to recovery of additional damages arising from the ongoing Internal Revenue audit any and all other consequential and compensatory damages proximately caused by Defendants' conduct, all as alleged above.

136. In doing the things herein alleged, Defendants acted willfully, fraudulently, oppressively, maliciously, and with a conscious disregard of the rights of the Plaintiffs. Accordingly, Plaintiffs are entitled to punitive damages in an amount to be determined by the trier of fact.

WHEREFORE, Plaintiffs pray for relief as follows:

a. For damages in the amount of $3.4 million or more, according to proof;

b. For further compensatory damages, according to proof, including but not limited to damages arising from the ongoing tax audit;

c. For pre-judgment interest on damages, according to proof;

d. For punitive damages in the amount to be determined by the trier of fact;

e. For costs of suit;

f. For such other and further relief as the Court deems just and proper in the premises.

## THIRD CLAIM FOR RELIEF

[AIDING AND ABETTING COMMON LAW FRAUD -- Against KARREN, HENDRIX,

HANDLER LAW FIRM, HANDLER, GREEN and DOES 1-1000]

137. The allegations of paragraphs 1-136 are incorporated herein by reference as if fully set forth herein.

138. As described above, from mid-2003 on, in promotional materials and in presentations, Defendants made representations to Plaintiffs and others concerning the viability and legality of Mare Lease Program.

139. Each of the representations alleged in this Complaint, including but not limited to those specified above in paragraph 128, was false when it was made and each of the omitted facts were facts

32

1    which Defendants had a duty to disclose.

2        140.    Defendants would have been incapable of perpetuating their fraud on participants,
3    including Plaintiffs, if it had not been for the legal, tax and financial opinions, as well as the business
4    presentations, marketing, and promotional support provided by Defendants KARREN, HENDRIX,
5    HANDLER LAW FIRM, HANDLER, GREEN and certain of DOES 1-1000. Such defendants aided
6    and abetted the promotion and marketing of the program through these activities.

7        141.    In order to induce Plaintiffs to participate in the Mare Lease Programs, and with the
8    intent that Plaintiffs rely on their representations, Defendants KARREN, HENDRIX, HANDLER
9    LAW FIRM, HANDLER, GREEN and certain of DOES 1-1000 gave substantial assistance or
10   encouragement to CLASSICSTAR and other Defendants in accomplishing their fraud on Plaintiffs.

11       142.    Defendants KARREN, HENDRIX, HANDLER LAW FIRM, HANDLER, GREEN and
12   certain of DOES 1-1000 knew that the representations of other Defendants and their own
13   representations regarding the validity of the Mare Lease Programs were false, or were made with
14   reckless disregard as to the truth or falsity thereof, and made their personal presentations and gave their
15   opinions knowing they were false or were made with reckless disregard as to the truth or falsity
16   thereof.

17       143.    Plaintiffs reasonably and justifiably relied on the representations of Defendants to their
18   detriment by, *inter alia*, their agreement to participate in the Mare Lease Programs and funding the
19   same.    Plaintiffs would not have agreed to enter into the Mare Lease Program but for the
20   representations of Defendants KAREN, HENDRIX, HANDLER LAW FIRM, HANDLER, GREEN
21   and various of the DOES 1-1000.

22       144.    Plaintiffs have suffered damages as a direct and proximate result of their reasonable
23   reliance on the misrepresentations of Defendants as aided and abetted by KAREN HENDRIX,
24   HANDLER LAW FIRM, HANDLER, GREEN and certain of the other DOES 1-1000. Moreover,
25   having participated in the Mare Lease Program, Plaintiffs were further induced to participate in the
26   Purchase and Exchange Program, compounding their damages.

27       145.    Plaintiffs have suffered damages as a direct and proximate result of their reasonable
28   reliance on the misrepresentations of Defendants.

33

146.    Plaintiffs are entitled to recovery of all damages proximately caused by the conduct of Defendants, including but not limited to the amount of $3.4 million or more, according to proof, plus pre-judgment interest.    Plaintiffs are entitled to recovery of additional damages arising from the ongoing Internal Revenue audit any and all other consequential and compensatory damages proximately caused by Defendants' conduct, all as alleged above.

147.    In doing the things herein alleged, Defendants acted willfully, fraudulently, oppressively, maliciously, and with a conscious disregard of the rights of the Plaintiffs.    Accordingly, Plaintiffs are entitled to punitive damages in an amount to be determined by the trier of fact.

WHEREFORE, Plaintiffs pray for relief as follows:

a.    For damages in the amount of $3.4 million or more, according to proof;

b.    For further compensatory damages, according to proof, including but not limited to damages arising from the ongoing tax audit;

c.    For pre-judgment interest on damages, according to proof;

d.    For punitive damages in the amount to be determined by the trier of fact;

e.    For costs of suit;

f.    For such other and further relief as the Court deems just and proper in the premises.

## FOURTH CLAIM FOR RELIEF

[NEGLIGENT MISREPRESENTATION – Against All Defendants and DOES 1-1000]

148.    The allegations of paragraphs 1-147 are incorporated by reference as if fully set forth herein.

149.    As an alternative allegation to the allegations of intentional misrepresentation, Defendants negligently made the representations alleged in this complaint, including but not limited to the representations set forth in Paragraph 128 and 130, in that said Defendants knew or should have known that there was no reasonable grounds for believing the representations were true when they made them.

150.    Defendants intended that the Plaintiffs rely upon their representations and the Plaintiffs did, in fact, rely upon Defendants' representations.

151.    The Plaintiffs have been harmed by their reliance upon Defendants' representations.

152. Plaintiffs reasonably and justifiably relied on the representations to their detriment by, *inter alia*, their agreement to participate in the Mare Lease Program and the Purchase and Exchange Program. The Plaintiffs would not have agreed to the Mare Lease Programs or the Purchase and Exchange Program but for the negligent misrepresentations of Defendants, and each of them, and certain of DOES 1-1000. Plaintiffs reasonably and justifiably relied on the representations of Defendants as set forth herein.

153. Plaintiffs have suffered damages as a direct and proximate result of their reasonable reliance on the negligent misrepresentations of Defendants.

154. Plaintiffs are entitled to recovery of all damages proximately caused by the conduct of Defendants, including but not limited to the amount of \$3.4 million or more, according to proof, plus pre-judgment interest. Plaintiffs are entitled to recovery of additional damages arising from the ongoing Internal Revenue audit any and all other consequential and compensatory damages proximately caused by Defendants' conduct, all as alleged above.

WHEREFORE, Plaintiffs pray for relief as follows:

a. For damages in the amount of \$3.4 million or more, according to proof;

b. For further compensatory damages, according to proof, including but not limited to damages arising form the ongoing tax audit;

c. For pre-judgment interest on damages, according to proof;

d. For costs of suit.

## FIFTH CLAIM FOR RELIEF

[BREACH OF CONTRACT -- Against CLASSICSTAR and DOES 1-1000]

155. The allegations of paragraphs 1-154 are incorporated by reference as if fully set forth herein.

156. Plaintiffs entered into and executed the contracts relating to the Mare Lease Programs, including the November 20, 2003, Letter of Understanding, the Mare Lease and Breeding Agreement dated on or about December 31, 2003, the Boarding Agreement dated on or about December 31, 2003, the Foal Agreement dated on or about December 31, 2003, the Nominee Agreement dated on or about December 31, 2003, and the Trade out Agreements dated on or about November 1, 2004, and January

35

1   27, 2005, as well as the   Purchase and Exchange Agreement (collectively the "Contracts with
2   CLASSICSTAR").

3       157.    Plaintiffs performed all of their obligations pursuant to the Contracts with
4   CLASSICSTAR.

5       158.    CLASSICSTAR failed to fulfill its obligations under the Purchase and Exchange
6   Agreement and breached the provisions of that agreement, including, *inter alia*, and without limitation,
7   its warranty that it owned the performance horses it claimed to provide in exchange for Plaintiffs'
8   Mare Lease Interests. CLASSICSTAR also failed to transfer ownership of any performance horses to
9   Plaintiffs.

10      159.    CLASSICSTAR has failed to perform its contractual obligations. It failed to deliver the
11  exchange horses and it has failed to pay the sums due and payable under the Purchase and Exchange
12  Agreement, including but not limited to payment of interest.  The conduct of CLASSICSTAR in
13  failing to make the required payments constitutes an anticipatory repudiation of their obligations under
14  the Purchase and Exchange Agreement to perform in July 2007 and pay the "put" price.

15      160.    As a direct and proximate result of CLASSICSTAR's breach, Plaintiffs have suffered
16  damages all as alleged above; Plaintiffs have lost property valued at $3.4 million or more, according to
17  proof.  In addition, due to CLASSICSTAR's anticipatory repudiation and breach, Plaintiffs will not
18  receive the "put" price.

19      161.    Plaintiffs are entitled to recovery of all damages proximately caused by the conduct of
20  Defendants, including but not limited to the amount of $3.4 million or more, according to proof, plus
21  pre-judgment interest.   Plaintiffs are entitled to recovery of additional damages arising from the
22  ongoing Internal Revenue audit any and all other consequential and compensatory damages
23  proximately caused by Defendants' conduct, all as alleged above.

24          WHEREFORE, Plaintiffs pray for relief as follows:

25      a.    For damages in the amount of $3.4 million or more, according to proof;

26      b.    For further compensatory damages, according to proof, including but not limited to
27          damages arising form the ongoing tax audit;

28      c.    For pre-judgment interest on damages, according to proof;

36

COMPLAINT

1  d.    For costs of suit;

2  e.    For such other and further relief as the Court deems just and proper in the premises.

3  ## SIXTH CLAIM FOR RELIEF

4  [RESCISSION OF RELEASE -- Against the CLASSICSTAR Defendants and DOES 1-1000]

5  162.    The allegations of paragraphs 1-161 are incorporated by reference as if fully set forth
6  herein.

7  163.    In order to induce Plaintiffs to participate in the Mare Lease Programs, and with the
8  intent that Plaintiffs rely on their representations, Defendants made misrepresentations of material fact
9  and omitted to disclose certain material facts which they had a duty to disclose.

10  164.    Pursuant to California Civil Code § 1668, all contracts which have for their object,
11  directly or indirectly, to exempt any one from responsibility for his own fraud, whether willful or
12  negligent, are against the policy of the law.

13  165.    Defendants procured the contracts associated with the Mare Lease Programs, including
14  the November 20, 2003, Letter of Understanding, the Mare Lease and Breeding Agreement dated on or
15  about December 31, 2003, the Boarding Agreement dated on or about December 31, 2003, the Foal
16  Agreement dated on or about December 31, 2003, the Nominee Agreement dated on or about
17  December 31, 2003, and the Trade out Agreements dated on or about November 1, 2004, and January
18  27, 2005, as well as the Purchase and Exchange Agreement (collectively the "Contracts with
19  CLASSICSTAR") by fraud, all as set forth above.

20  166.    The release contained in the Purchase and Exchange Agreement purports to exempt the
21  CLASSICSTAR Defendants from any claim or cause of action arising out of the Contracts with
22  CLASSICSTAR.

23  167.    Pursuant to California Civil Code § 1689, Plaintiffs are entitled to rescind the release
24  provision of the Purchase and Exchange Agreement because the Plaintiffs' consent to the Contracts
25  with CLASSICSTAR, and specifically to the release provision contained in the Purchase and
26  Exchange Agreement, was procured through fraud exercised by or with the CLASSICSTAR
27  Defendants. By service of this Complaint, Plaintiffs give notice of rescission of the release to the
28  extent such notice is required.

COMPLAINT

1    168.    Plaintiffs seek rescission and severance of the release clause contained in the Purchase

2    and Exchange Agreement since it was procured by fraud and is thereby against the policy of law as set

3    forth in the California Civil Code.

4    WHEREFORE, Plaintiffs pray for relief as set forth below:

5    a.    For rescission of the release provision of the Purchase and Exchange Agreement and

6    any and all other clauses of the Purchase and Exchange Agreement the Court deems

7    necessary in order to obtain an equitable result;

8    b.    For restitution of all consideration given under the Purchase and Exchange Agreement;

9    c.    For costs of suit;

10    d.    For such other and further relief as the Court deems just and proper in the premises.

11    **SEVENTH CLAIM FOR RELIEF**

12    [CONSTRUCTIVE TRUST -- Against All Defendants and DOES 1-1000]

13    169.    The allegations of paragraphs 1-168 are incorporated by reference as if fully set forth

14    herein.

15    170.    Plaintiffs paid CLASSICSTAR Three Million Four Hundred Thousand Dollars

16    ($3,400,000) between 2003 and 2004.

17    171.    On information and belief, Defendants used funds wrongfully acquired from the

18    Plaintiffs to acquire property which, on information and belief, is currently in Defendants' possession.

19    172.    Having obtained Plaintiffs' funds through the improper and fraudulent means as alleged

20    herein, Defendants hold those funds or their proceeds in constructive trust for Plaintiffs and must

21    return or account for same. A constructive trust should be imposed on and against any and all property

22    acquired or held by Defendants with the property or money of Plaintiffs.

23    173.    To the extent that Defendants intend to dispose of or distribute such property, such

24    disposition will cause irreparable harm to Plaintiffs for which there is no remedy at law.

25    WHEREFORE, Plaintiffs pray for relief as follows:

26    a.    For damages in the amount of $3.4 million or more, according to proof;

27    b.    For further compensatory damages, according to proof, including but not limited to

28    damages arising form the ongoing tax audit;

38

COMPLAINT

c.     For pre-judgment interest on damages, according to proof;

d.     For imposition of a constructive trust for the benefit of Plaintiffs on all money and/or property acquired by Defendants;

e.     For costs of suit;

f.     For such other and further relief as the Court deems just and proper in the premises.

## EIGHTH CLAIM FOR RELIEF

[UNJUST ENRICHMENT -- Against All Defendants and DOES 1-1000]

174.    The allegations of paragraphs 1-173 are incorporated by reference as if fully set forth herein.

175.    Plaintiffs made payments to Defendants based on Defendants' misrepresentations as alleged herein, and these payments were deposited in accounts controlled by Defendants. Defendants further fraudulently induced Plaintiffs into entering into the Purchase and Exchange Agreement, all as alleged herein.

176.    Defendants were not entitled to these funds which were obtained from Plaintiffs through fraud and improper means, and Plaintiffs would not have transferred the funds had the true nature of the transaction been known.

177.    Defendants have been unjustly enriched by obtaining money and property from Plaintiffs by fraud.

178.    As a result of Defendants' unjust receipt of these sums, Plaintiffs have sustained damages, including but not limited to the amount of their payments.

WHEREFORE, Plaintiffs pray for relief as follows:

a.     For damages in the amount of $3.4 million or more, according to proof;

b.     For further compensatory damages, according to proof, including but not limited to damages arising form the ongoing tax audit;

c.     For pre-judgment interest on damages, according to proof;

d.     For costs of suit;

e.     For such other and further relief as the Court deems just and proper in the premises.

## NINTH CLAIM FOR RELIEF

[MONEY AND PROPERTY HAD AND RECEIVED -- Against All Defendants and DOES 1-1000]

179.    The allegations of paragraphs 1-178 are incorporated by reference as if fully set forth herein.

180.    Defendants received money and property of Plaintiffs and hold money and property that in equity belong to Plaintiffs, which Plaintiffs are equitably and legally entitled to recover.

WHEREFORE, Plaintiffs pray for relief as follows:

a.    For damages in the amount of $3.4 million or more, according to proof;

b.    For further compensatory damages, according to proof, including but not limited to damages arising form the ongoing tax audit;

c.    For pre-judgment interest on damages, according to proof;

d.    For costs of suit;

e.    For such other and further relief as the Court deems just and proper in the premises.

## **TENTH CLAIM FOR RELIEF**

[ACCOUNTING – Against CLASSICSTAR, D. PLUMMER, S. PLUMMER, BUFFALO RANCH and DOES 1-1000]

181.    The allegations of paragraphs 1-180 are incorporated by reference as if fully set forth herein.

182.    Plaintiffs are entitled to an accounting from CLASSICSTAR, D. PLUMMER, S. PLUMMER, BUFFALO RANCH, and other Defendants with regard to Plaintiffs' ownership interest in Plaintiffs' Mare Lease Interests as well as the performance horses that CLASSICSTAR exchanged for Plaintiffs' 2004 Mare Lease Interests, including the current status of title to each mare, foal and performance horse that CLASSICSTAR represented as belonging to Plaintiffs or in which Plaintiffs had an interest.

183.    To the extent that CLASSICSTAR, D. PLUMMER, S. PLUMMER and/or BUFFALO RANCH intends to dispose of or distribute such property prior to accounting, such disposition will cause irreparable harm to Plaintiffs for which there is no remedy at law.

WHEREFORE, Plaintiffs pray for relief as follows:

a.    For an accounting of the disposition of all money and property of Plaintiffs;

40

1    b.    For costs of suit;

2    c.    For such other and further relief as the Court deems just and proper in the premises.

3                                      **ELEVENTH CLAIM FOR RELIEF**

4              [CIVIL THEFT -- Against the CLASSICSTAR Defendants and DOES 1-1000]

5    184.    The allegations of paragraphs 1-183 are incorporated by reference as if fully set forth

6    herein.

7    185.    California Penal Code Section 484(a) provides in pertinent part as follows:

8                   Every person who shall feloniously steal . . . the personal
                  property of another . . . or who shall knowingly and
9                   designedly, by any false or fraudulent representation or
                  pretense, defraud any other person of money . . or personal
10                  property . . . is guilty of theft. . . . For the purposes of this
                  section, any false or fraudulent representation or pretense
11                  made shall be treated as continuing, so as to cover any
                  money, property or service received as a result thereof, and
12                  the complaint, information or indictment may charge that
                  the crime was committed on any date during the particular
13                  period in question.

14

15   186.    California Penal Code Section 496(a) provides in pertinent part as follows:
                  Every person who buys or receives any property that has
16                  been stolen or that has been obtained in any manner
                  constituting theft or extortion, knowing the property to be
17                  so stolen or obtained, or who conceals, sells, withholds, or
                  aids in concealing, selling, or withholding any property
18                  from the owner, knowing the property to be so stolen or
                  obtained, shall be punished by imprisonment in a state
19                  prison, or in a county jail for not more than one year. . . .

20
     187.    California Penal Code Section 496(c) provides a civil remedy as follows:
21                  Any person who has been injured by a violation of
                  subdivision (a) or (b) may bring an action for three times
22                  the amount of actual damages, if any, sustained by the
                  plaintiff, if any, costs of suit, and reasonable attorney's
23                  fees.

24
     188.    The CLASSICSTAR Defendants, and each of them, with an intent to permanently
25
     deprive Plaintiffs, fraudulently appropriated money and/or property of Plaintiffs. The CLASSICSTAR
26
     Defendants, and each of them, knowingly and designedly, by false or fraudulent representations or
27
     pretenses, defrauded Plaintiffs of money and/or property by fraudulently inducing Plaintiffs to enter
28

                                                  41

1  into the Purchase and Exchange Program and turn over their interests in the Mare Lease Programs
2  when the equine interests Plaintiffs purportedly were to receive under the Purchase and Exchange
3  Program did not, in fact, exist. To date, the CLASSICSTAR Defendants, and each of them, have
4  withheld from Plaintiffs the value of the Mare Lease Program or the Purchase and Exchange Program
5  and have withheld the sums due under the Purchase and Exchange Program. This conduct constitutes
6  theft in violation of California Penal Code Sections 484 and 496 and gives rise to liability under
7  Section 496(c) of the Penal Code. The CLASSICSTAR Defendants' theft and unlawful withholding of
8  Plaintiffs' money and property is continuing in that Defendants have failed and refused to deliver
9  payments to Plaintiffs after repeated demands and have fraudulently obtained and retained Plaintiffs'
10  property.

11  189.  The theft by the CLASSICSTAR Defendants, and each of them, has proximately
12  damaged Plaintiffs by, *inter alia*, depriving Plaintiffs of their money and/or property. Pursuant to
13  California Penal Code Section 496 (c), Plaintiffs are entitled to: (a) three times the amount of their
14  actual damages; (b) costs of suit and (c) reasonable attorneys' fees.

15  190.  The conduct of the CLASSICSTAR Defendants, and each of them, was willful,
16  oppressive, fraudulent and malicious and in conscious disregard of the rights of Plaintiffs so as to
17  justify the imposition of punitive damages against the CLASSICSTAR Defendants, and each of them,
18  pursuant to California Civil Code Section 3294, in an amount to be determined by the trier of fact.

19  WHEREFORE, Plaintiffs pray for relief as follows:

20  a.  For damages in the amount of $3.4 million or more, according to proof;

21  b.  For further compensatory damages, according to proof, including but not limited to
22  damages arising form the ongoing tax audit;

23  c.  For pre-judgment interest on damages according to proof;

24  d.  For treble damages;

25  e.  For punitive damages in an amount to be determined by the trier of fact;

26  f.  For attorneys' fees;

27  g.  For costs of suit;

28  h.  For such other and further relief as the Court deems just and proper in the premises.

42

1

## TWELFTH CAUSE OF ACTION

2     [AIDING AND ABETTING CIVIL THEFT -- Against the CLASSICSTAR Defendants

3     and DOES 1-1000]

4     191.    The allegations of paragraphs 1-190 are incorporated by reference as if fully set forth

5     herein.

6     192.    California Penal Code Section 484(a) provides in pertinent part as follows:

7               Every person who shall feloniously steal . . . the personal
                property of another . . . or who shall knowingly and

8               designedly, by any false or fraudulent representation or
                pretense, defraud any other person of money . . or personal

9               property . . . is guilty of theft. . . . For the purposes of this
                section, any false or fraudulent representation or pretense

10              made shall be treated as continuing, so as to cover any
                money, property or service received as a result thereof, and

11              the complaint, information or indictment may charge that
                the crime was committed on any date during the particular

12              period in question.

13

14    193.    California Penal Code Section 496(a) provides in pertinent part as follows:

15              Every person who buys or receives any property that has
                been stolen or that has been obtained in any manner

16              constituting theft or extortion, knowing the property to be
                so stolen or obtained, or who conceals, sells, withholds, or

17              aids in concealing, selling, or withholding any property
                from the owner, knowing the property to be so stolen or

18              obtained, shall be punished by imprisonment in a state
                prison, or in a county jail for not more than one year. . . .

19

20    194.    California Penal Code Section 496(c) provides a civil remedy as follows:

              Any person who has been injured by a violation of

21              subdivision (a) or (b) may bring an action for three times
                the amount of actual damages, if any, sustained by the

22              plaintiff, if any, costs of suit, and reasonable attorney's
                fees.

23

24    195.    The Plaintiffs' money and/or property has been obtained by Defendants in a manner

25    constituting theft, within the meaning ascribed in California Penal Code Section 484, as alleged herein.

26    196.    On information and belief, the CLASSICSTAR Defendants and certain of DOES 1-

27    1000 inclusive, and each of them, knew that the Plaintiffs' money and/or property were obtained in a

28    manner constituting theft. The CLASSICSTAR Defendants, and each of them nevertheless aided and

43

1   abetted the CLASSICSTAR Defendants in the withholding of Plaintiffs' money and/or property.

2       197.    By aiding and abetting the CLASSICSTAR Defendants, and each of them, the
3   CLASSICSTAR Defendants, and each of them, violated Penal Code Section 496.

4       198.    Accordingly, the CLASSICSTAR Defendants and certain of DOES 1-1000 inclusive,
5   are liable to Plaintiffs for damages and for treble damages, attorneys' fees and costs recoverable under
6   California Penal Code Section 496 (c).

7       199.    In doing the things herein alleged, Defendants acted willfully, fraudulently,
8   oppressively, maliciously, and with a conscious disregard of the rights of the Plaintiffs. Accordingly,
9   Plaintiffs are entitled to punitive damages in an amount to be determined by the trier of fact.

10      WHEREFORE, Plaintiffs pray for relief as follows:

11      a.      For damages in the amount of $3.4 million or more, according to proof;

12      b.      For further compensatory damages, according to proof, including but not limited to
13              damages arising form the ongoing tax audit;

14      c.      For pre-judgment interest on damages according to proof;

15      d.      For treble damages;

16      e.      For punitive damages in the amount to be determined by the trier of fact;

17      f.      For attorneys' fees;

18      g.      For costs of suit;

19      h.      For such other and further relief as the Court deems just and proper in the premises.

20                              **THIRTEENTH CLAIM FOR RELIEF**

21          [CONVERSION -- Against the CLASSICSTAR Defendants and DOES 1-1000]

22      200.    The allegations of paragraphs 1-199 are incorporated by reference as if fully set forth
23   herein.

24      201.    The CLASSICSTAR Defendants and certain of DOES 1 to 1000, and each of them,
25   through their fraudulent representations and conduct, as alleged herein, including but not limited to the
26   allegations set forth in Paragraphs 128 and 130 herein, which are incorporated by reference, obtained
27   $3.4 million of Plaintiffs' money as well as Plaintiffs' equine interests in thoroughbred foals that were
28   obtained by Plaintiffs through their participation in the Mare and Lease Program.

202.    By virtue of the terms of the Purchase and Exchange Program, and according to the CLASSICSTAR Defendants' representations regarding that program, Plaintiffs exchanged their equine interests for interests in performance horses and were to be paid interest at the rate of four percent (4%) per quarter on their initial business contribution of $3.4 million dollars.  Plaintiffs would then be entitled to sell the horses back to CLASSICSTAR at a date certain for the full amount of the original $3.4 million contribution plus a "put price" twenty percent (20%) higher than the original contribution, resulting in a premium sale over the contribution amount and a guaranteed thirty percent (30%) return.

203.    Through the fraudulent Purchase and Exchange Program, Defendants, and each of them, have taken possession of Plaintiffs initial business contribution as well as their equine interests for a significant amount of time and have failed to respond to Plaintiffs' demands for their return.

204.    The Plaintiffs now know that the purported quarter horse foals that were the subject of the Purchase and Exchange Program do not exist, have never existed and will never exist.  Plaintiffs did not discover that the horses did not exist, and therefore did not discover the CLASSICSTAR Defendants' conversion of their money and equine interests, until the Fall of 2006.

205.    The CLASSICSTAR Defendants, and each of them, by the fraudulent means alleged herein, including but not limited to the CLASSICSTAR Defendants' inducement of Plaintiffs to participate in the Purchase and Exchange Program, misappropriated and converted to their use and possession, without Plaintiffs' knowledge or consent, Plaintiffs' money and equine interests.

206.    The CLASSICSTAR Defendants' conversion and unlawful withholding of Plaintiffs' money and property is continuing in that the CLASSICSTAR Defendants have failed and refused to deliver Plaintiffs' money and property after repeated demands and have fraudulently obtained and retained Plaintiffs' money and property.

207.    As a proximate result of the CLASSICSTAR Defendants' conversion and embezzlement, Plaintiffs have suffered damages in that they have not received the benefits of their breeding business, they have been deprived of the money they used to fund their business in the amount of $3.4 million, their equine interests, and all sums due and owing to Plaintiffs under the Purchase and Exchange Agreement.  Moreover, they have suffered and will suffer additional damages as a result of the IRS audit.  Plaintiffs reserve the right to amend this Complaint to set forth the full

1 extent of their damages when ascertained.

2 208. In doing the things herein alleged, the CLASSICSTAR Defendants and certain of DOES

3 1-1000, and each of them, acted willfully, oppressively, fraudulently and maliciously, and with a

4 conscious disregard of the rights of Plaintiffs and, accordingly, Plaintiffs are entitled to recovery of

5 punitive damages in an amount to be determined by the trier of fact.

6 WHEREFORE, Plaintiffs pray for relief as follows:

7 a. For damages in the amount of $3.4 Million, or more, according to proof;

8 b. For pre-judgment interest at the legal rate;

9 c. For costs, expenses and attorneys' fees;

10 d. For punitive damages to be determined by the trier of fact; and

11 e. For such other and further relief as the Court may deem proper in the premises.

12 **FOURTEENTH CLAIM FOR RELIEF**

13 [NEGLIGENCE -- Against All Defendants and DOES 1-1000]

14 209. The allegations of paragraphs 1-208 are incorporated by reference as if fully set forth

15 herein.

16 210. The Defendants and certain of DOES 1-1000, and each of them, directly or indirectly,

17 negligently developed, structured, marketed, promoted and/or executed the Mare Lease Program

18 and/or the Purchase and Exchange Program when they knew, or in the exercise of ordinary care,

19 should have known that the programs were not viable, that the tax attributes likely would not pass

20 muster under IRS Code requirements and that Plaintiffs' business interests in the programs would

21 become worthless.

22 211. At all times material hereto, Defendants and certain of DOES 1-1000 had a duty to

23 Plaintiffs to exercise reasonable care in their dealings and advisement to Plaintiffs regarding the

24 business interests sold in the programs and the viability of the tax saving strategies.

25 212. Defendants and certain of DOES 1-1000, and each of them, breached their duties and

26 were negligent in their actions, misrepresentations and omissions toward Plaintiffs, including but not

27 limited to, in that they:

28 a. marketed, promoted, advised and recommended that Plaintiffs engage in the Mare Lease

46

COMPLAINT

Program and/or the Purchase and Exchange Program as viable programs when they were not;

b. advised Plaintiffs that the tax attributes in the programs as represented were legitimate, proper and in accordance with all applicable tax laws, rules and regulations;

c. failed to advise Plaintiffs that if they filed tax returns claiming losses based on the tax attributes represented in the programs that Plaintiffs would be audited and all of their tax positions (based on those representations) potentially disallowed with potential exposure for interest and penalties as well as additional tax;

d. failed to revise, alter, amend or modify the advice, recommendations, instructions, representations and opinions made to Plaintiffs regarding the propriety of the tax attributes or the financial viability of the programs;

e. failed to advise Plaintiffs that Defendants, or some of them, had engaged in criminal conduct justifying a criminal investigation by the IRS.

213.    Defendants and certain of DOES 1 to 1000 knew or should have known that the programs were not viable and that the IRS would challenge the tax positions. Nevertheless, Defendants and DOES 1 to 1000 actively and aggressively developed, structured, marketed, promoted and/or executed the programs.

214.    Defendants and certain of DOES 1 to 1000 owed Plaintiffs a legal duty of care to act in an ordinary prudent and reasonable manner so as not to damage or cause injury to Plaintiffs.

215.    Defendants, and each of them, breached their duties of care by, including without limitation, engaging in the wrongful conduct alleged herein.

216.    At the times Defendants, and each of them, engaged in the wrongful conduct alleged herein, it was foreseeable that said conduct would cause an unreasonable risk of harm to Plaintiffs;

217.    Plaintiffs did not discover Defendants' breaches of duty until the Fall of 2006.

218.    The Defendants' negligence was the proximate and legal cause of the Plaintiffs' injuries.

219.    The Plaintiffs have been harmed by Defendants' negligence as follows: (a) they are currently being audited by the IRS, have incurred legal expenses defending the audit and the outcome is not known but potentially may result in liability for additional tax, interest and penalties; (b) their

1    contribution of $3.4 million to their mare leasing business, as well as their equine interests, have been

2    lost; (c) they have not received the benefits of their breeding business; (d) they have not received the

3    sums due and owing to them under the Purchase and Exchange Program; and (e) they have incurred

4    other damages, according to proof.

5       WHEREFORE, Plaintiffs pray for relief as follows:

6         a.  For damages in the amount of $3.4 Million, or more, according to proof;

7         b.  For further compensatory damages according to proof, including but not limited

8            to damages arising form the ongoing tax audit;

9         c.  For pre-judgment interest on damages according to proof;

10         d.  For costs of suit;

11         e.  For such other and further relief as the Court deems just and proper in the

12            premises.

13               IDELL & SEITEL LLP

14

15    Dated: May 14, 2007     By:  _____

16               Richard J. Idell

           Ory Sandel

17               Elizabeth J. Rest

           Attorneys for Plaintiffs Gregory R. Raifman and Susan

18               Raifman, individually and as Trustees for the Raifman

           Family Revocable Trust Dated 7/2/03, and Gekko

19               Holdings, LLC, an Alaska limited liability company, dba

20               Gekko Breeding and Racing

21           **DEMAND FOR JURY TRIAL**

22       The Plaintiffs hereby demand a trial by jury in the above matter.

23               IDELL & SEITEL LLP

24

25    Dated: May 14, 2007     By:  _____

26               Richard J. Idell

           Ory Sandel

27               Elizabeth J. Rest

           Attorneys for Plaintiffs Gregory R. Raifman and Susan

28               Raifman, individually and as Trustees for the Raifman

Family Revocable Trust Dated 7/2/03, and Gekko
Holdings, LLC, an Alaska limited liability company, dba
Gekko Breeding and Racing